1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE SOUTHERN DISTRICT OF TEXAS

3                           HOUSTON DIVISION

4
    ELIZABETH GUFFY                §       CASE NO:  4:16-CV-43
5                                   §       HOUSTON, TEXAS
    VERSUS                          §       TUESDAY,
6                                   §       MARCH 8, 2016
    DICK DEGUERIN, ET AL            §       1:26 P.M. TO 3:13 P.M.
7   ************************************************************
    ELIZABETH GUFFY                 §       CASE NOS:  4:16-CV-84
8                                   §       HOUSTON, TEXAS
    VERSUS                          §       TUESDAY,
9                                   §       MARCH 8, 2016
    MARSHALL DAVIS BROWN, JR.,      §
10  ET AL                           §       1:26 P.M. TO 3:13 P.M.

11
                           SCHEDULING CONFERENCE
12

13                BEFORE THE HONORABLE NANCY F. ATLAS
                     UNITED STATES DISTRICT JUDGE
14

15                            APPEARANCES:

16      FOR PLAINTIFF/DEFENDANT:    SEE NEXT PAGE

17      ERO:                        MELISSA MILLER

18      CASE MANAGER:               SHELIA ASHABRANNER

19

20                  TRANSCRIPTION SERVICE BY:

21              JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                     935 ELDRIDGE ROAD, #144
22                     SUGAR LAND, TEXAS 77478
              Tel:  281-277-5325 / Fax:  281-277-0946
23                 www.judicialtranscribers.com

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

1                         APPEARANCES:

2

3    FOR THE PLAN AGENT:            AMY WOLFSHOHL, ESQ.
                                    STEPHANIE HOLCOMBE, ESQ.
4                                   PORTER HEDGES, LLP
                                    1000 MAIN STREET
5                                   36TH FLOOR
                                    HOUSTON, TX 77002
6
     FOR THE DEFENDANT,             STEVEN A. LEYH, ESQ.
7    DICK DEGUERIN:                 LEYH, PAYNE & MALLIA, PLLC
                                    9545 KATY FREEWAY, SUITE 200
8                                   HOUSTON, TX 77024

9    FOR THE DEFENDANTS,            PETER JOHNSON, ESQ.
     BRIAN WICE & CATHY E.          LAW OFFICES OF PETER JOHNSON
10   BENNETT & ASSOCIATES,          11 GREENWAY PLAZA
     INC.:                          SUITE 2820
11                                  HOUSTON, TX 77046

12   FOR THE DEFENDANT,             JIMMY R. PHILLIPS, JR., ESQ.
     KATHERINE SCARDINO             ATTORNEY AT LAW
13                                  P.O. DRAWER 29
                                    ANGLETON, TX 77516
14
     FOR THE DEFENDANT              JOAN KEHLHOF, ESQ.
15   MORITZ ASSOCIATES, INC.        WIST HOLLAND
                                    720 N POST OAK ROAD
16                                  SUITE 610
                                    HOUSTON, TX 77024
17

18   FOR THE DEFENDANT,             CRAIG COWGILL, ESQ.
     DICK DEGUERIN
19
     FOR THE DEFENDANT,             CHRISTIAN M. STERNAT, ESQ.
20   CERTIFIED APPRAISERS,          ATTORNEY AT LAW
     INC.:                          1111 NORTH LOOP WEST,
21                                  #1115
                                    HOUSTON, TX 77008
22
     FOR THE DEFENDANT,             MIGUEL A. SANCHEZ-ROSS, ESQ.
23   DERRYCK DESHAUN COLLINS:       FOREMAN, DEGEURIN, DEGEURIN
                                    300 MAIN STREET
24                                  3RD FLOOR
                                    HOUSTON, TX 77002
25

```
 1                        APPEARANCES (CONT'D):

 2   FOR MARSHALL DAVIS           PRESTON T. TOWBER, ESQ.
     BROWN, JR.:                  THE TOWBER LAW FIRM, PLLC
 3                                6750 WEST LOOP SOUTH
                                  SUITE 920
 4                                BELLAIRE, TX 77401

 5
     FOR THE DEFENDANT,           TOM ALAN CUNNINGHAM, ESQ.
 6   ROBERT HOFFMAN AND           CUNNINGHAM DARLOW, LLP
     JEDEDIAH MOFFETT:            919 MILAM STREET
 7                                SUITE 575
                                  HOUSTON, TX 77002
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          HOUSTON, TUESDAY, MARCH 8, 2016; 1:26 P.M.

2          THE CLERK:  Hear Ye, Hear Ye, Hear Ye.  The United

3   States District Court for the Southern District of Texas,

4   the Honorable Nancy F. Atlas presiding, is now in session.

5          God save these United States and this Honorable

6   Court.

7          THE COURT:  Please be seated.  Good morning --

8   good afternoon.

9          This is the case of Guffy versus DeGuerin, et al,

10  and Guffy versus Brown.

11         Would Counsel state your appearances in the

12  DeGuerin case, first?

13         MR. LEYH:  Good afternoon, Your Honor, Steven

14  Leyh, L-E-Y-H, on behalf of Dick DeGuerin.

15         MR. JOHNSON:  Good afternoon, Your Honor.  Peter

16  Johnson, J-O-H-N-S-O-N, here on behalf of Brian Wice and

17  Cathy E. Bennett & Associates.

18         MR. PHILLIPS:  Good evening, Your Honor, Jimmy

19  Phillips, Jr., on behalf of Katherine Scardino.

20         MS. KEHLHOF:  Your Honor, Joan Kehlhof,

21  K-E-H-L-H-O-F, on behalf of Moritz and Associates, Inc.

22         MR. COWGILL:  Good afternoon, Your Honor, Craig

23  Cowgill on behalf of DeGuerin.

24         MR. STERNAT:  Good afternoon, Your Honor,

25  Christian Sternat on behalf of Certified Appraisers, Inc.

1          MS. WOLFSHOHL:  And Amy Wolfshohl on Stephanie

2   Holcombe on behalf of the Plan Agent.

3          THE COURT:  Okay, other case

4          MR. CUNNINGHAM:  The other case, Your Honor.  My

5   name is Tom Cunningham with my partner, Debbie Darlow, and

6   we represent Robert Hoffman and Jed Moffet and their two

7   firms.

8          THE COURT:  Okay.

9          MR. TOWBER:  Good afternoon, Your Honor, Preston

10  Towber, T-O-W-B-E-R, And I represent Marshall Davis Brown,

11  Jr., Pavlas, Brown and York, LLP, and Pavlas Brown, LLP.

12         THE COURT:  Okay.  This is a series of cases that

13  I have withdrawn the reference to the Bankruptcy Court in,

14  and I want to do schedules with you.

15         I would like to be sure that we get full initial

16  disclosures for both sides, actually.  It will simplify life

17  later and also help frame the issues.

18         The trust, well, the plan, -- I guess you ---

19         MS. WOLFSHOHL:  Plan agent.

20         THE COURT:  The Plan Agent?

21         MS. WOLFSHOHL:  Yes.

22         THE COURT:  The Plan Agent has listed a lot of

23  transfers in the complaints, but I was a little unclear

24  whether there are complaints about indirect payments.  If

25  you want to elaborate a little bit, you can.  I assume you

1  had some time with the records, so you should know.

2          MS. WOLFSHOHL:  Yes, Judge.  At this point in

3  time, we are primarily alleging direct transfers and we have

4  experts preparing tracing analysis to determine whether or

5  not some of those indirect transfers -- some of those direct

6  transfers might be indirect transfers.

7          So, as part of our initial disclosure process, we

8  are trying to narrow down some of the transfers to determine

9  whether or not they are direct and indirect, and that's

10  ongoing right now.  So I know that you wanted us to do

11  thorough disclosures, and fairly quickly.  I'd like to have

12  just a little bit of time with those experts in order to

13  be --

14          THE COURT:  Sure.

15          MS. WOLFSHOHL:  -- able to, perhaps even narrow

16  down some of the transfers.

17          THE COURT:  What are you thinking timewise, just

18  give me some estimate.  It will affect our schedule.

19          MS. WOLFSHOHL:  I believe six weeks would be

20  enough time.

21          THE COURT:  So, we're talking at the beginning of

22  March, end of April?

23          MS. WOLFSHOHL:  Right.

24          THE COURT:  You want more than six weeks actually.

25          MS. WOLFSHOHL:  Yes, I think, yeah, the end of

1  April.

2           THE COURT:  That would be seven weeks?

3           MS. WOLFSHOHL:  Yes, the end of April would be

4  fine for that.

5           THE COURT:  Okay, 29th of April, then.  If you

6  need a little extra time, it's okay.  I'm just trying to get

7  a frame of reference.

8           MS. WOLFSHOHL:  I think that will be enough time,

9  but if it's not, hopefully we can agree amongst the parties.

10           THE COURT:  Your theory seems to be that the

11  Debtor, Brown Medical Center, paid all these bills and got

12  no benefit, certainly none directly.

13           MS. WOLFSHOHL:  Yes, that's right.

14           THE COURT:  And so is there a different theory

15  lurking or is that it?

16           MS. WOLFSHOHL:  No, I mean our theories are found

17  on transfers, and --

18           THE COURT:  Just because the corporate form and

19  even though Dr. Brown owned all of the stock of the medical

20  center.

21           MS. WOLFSHOHL:  Yes, I mean, it's a little

22  different for the different cases.  In the divorce case,

23  with Rachel Brown's divorce lawyers, we would -- our theory

24  is that the benefit, if any, ran to Rachel Brown.

25           THE COURT:  That was going to be my next question.

1          MS. WOLFSHOHL:  Yes, and not Michael Brown.

2          In the DeGuerin matter --

3          THE COURT:  Although, didn't -- I didn't

4    understand whether Michael Brown had a Court-ordered

5    obligation to pay Rachel Brown's legal fees or whether he

6    was doing it in anticipation of that kind of an order,

7    because he --

8        (Both speaking.)

9          MS. WOLFSHOHL:  I believe he was ordered to pay

10   some of her fees.  I couldn't tell you exactly what number

11   that was, but I do believe he was ordered by the Court to

12   pay some of those fees.  BMC certainly was not ordered to

13   pay all of those fees.

14         THE COURT:  Okay, all right.  So, from the Defense

15   standpoint, and I'm open to hearing from anybody, what's the

16   defense?  Is there -- go ahead.

17         MR. CUNNINGHAM:  I'll start, Your Honor.  Looking

18   at the pleading, it's hard to tell because the flow of

19   checks is complicated because, in fact, I believe, if I'm

20   not mistaken, that all of the payments that were paid for

21   Rachel's lawyers were paid pursuant to Court Order.

22         THE COURT:  Okay.

23         MR. CUNNINGHAM:  That was an initial, you know, if

24   you get a divorce, the first thing they do is preliminary

25   orders, and I believe that was part of it.

1        THE COURT:  Okay.

2        MR. CUNNINGHAM:  And so throughout that, and then

3   as it wound down or wound up, Mr. Indelicato was appointed

4   to be a Master of Chancery, initially for discovery and

5   then, secondly, to review the bills as they got larger and

6   more complicated, and, of course, Ms. Canales was appointed

7   for child advocate and they've been dealt with in your

8   Order.

9        The full of funds and the way it's described in

10  the Complaint makes it very difficult for us to respond, and

11  I don't mean to be avoiding of the issue, it's just that

12  payments were made to Mr. Indelicato, for example, and then

13  pursuant to Court Order, he made payments, and there's a

14  *custodia legis* problem there because we think they become

15  state funds at that point, and they are under the custody of

16  the Court, which we think interrupts the chain of custody

17  for purposes of fraudulent transfer.

18        But be that as it may, some payments went to

19  Mr. Indelicato, some payments went from Mr. Indelicato to

20  Michael -- or to David Brown, who was one of the lawyers

21  representing Rachel Brown.

22        THE COURT:  David Brown?

23        MR. CUNNINGHAM:  Marshall Davis Brown --

24        MS. WOLFSHOHL:  Marshall Brown.

25        MR. CUNNINGHAM:  -- who is one of the Defendants

1  in this case.

2          MR. TOWBER:  That's my client, Your Honor.

3          MR. CUNNINGHAM:  Right.  And the Browns get

4  confused because we've got Dr. Brown, who is the decedent,

5  Rachel Brown who is the wife, and David Brown, who is one of

6  the lawyers, so --

7          THE COURT:  Is David related to Michael or Rachel?

8          MR. CUNNINGHAM:  No, absolutely not.  No, they are

9  quite adverse.

10          THE COURT:  Well, related, you know, you could

11  have a fight with your brother.

12          MR. CUNNINGHAM:  I suppose so, but I don't believe

13  that's the case.

14          THE COURT:  Okay, they are not --

15          MR. CUNNINGHAM:  I don't believe that's the case

16  in this instance.  It's at least we know -- I am certain

17  that David Brown probably would have had that researched

18  before he got involved in the contentious divorce that he

19  did.

20          THE COURT:  Okay.

21          MR. CUNNINGHAM:  Be that as it may, I don't think

22  there's any --

23          THE COURT:  David Brown was Rachel's -- ?

24          MR. CUNNINGHAM:  Lawyer.

25          THE COURT:  Lawyer, got it.

1          MR. CUNNINGHAM:  David Brown, initially -- Jed

2    Moffet, our client, was engaged by Rachel, and then as

3    things got more complicated, she engaged David Brown to

4    assist and essentially be more or less the lead counsel in

5    the divorce.

6          THE COURT:  Okay.

7          MR. CUNNINGHAM:  And then David Brown engaged our

8    client, Robert Hoffman to assist in tracing because there

9    were lots of tracing issues.  This money was all over the

10   place because Dr. Brown was very wealthy, et cetera, and

11   that's how those three got involved.  Now, the flow of funds

12   was principally after the three of them got involved, and

13   they got involved at different times.

14         The flow of funds was principally through David

15   Brown, and he would receive payments from either Dr. Brown

16   or Joe Indelicato.  I think there's a couple of them from

17   BMCI, and then he would distribute those payments to the

18   other lawyers, and so we only got payments from David Brown.

19   I believe that was also true after David Brown was engaged.

20   That's also true of Jed Moffet.

21         And so then we've got Indelicato involved.  We've

22   got David Brown involved. Robert Hoffman is not mentioned in

23   any of the lists of checks that you see in the complaint,

24   and so we're having a little bit of a difficult time

25   figuring out what they really are alleging we got.

1           THE COURT:  Okay.

2           MR. CUNNINGHAM:  And so, in terms of our

3  disclosures, if that's really where you are going, we'd like

4  a little time to see what they are doing to be able to

5  respond.

6           THE COURT:  Okay.  Well, I don't know if anyone is

7  claiming some sort of a privilege but I'm not seeing

8  privilege here.  I'm not hearing it articulated either.

9           MR. CUNNINGHAM:  Not so, far, Judge.

10           THE COURT:  Okay.  To the extent that your defense

11  is, "I didn't get any money, and my people didn't get any

12  money from BMC."

13           MR. CUNNINGHAM:  BMCI, right.

14           THE COURT:  You might want to start looking at

15  where your people did get money from --

16           MR. CUNNINGHAM:  Yes.

17           THE COURT:  -- to assist, because while the burden

18  is on the Plan Agent, my goal is to get to the heart of the

19  matter as quickly as we can, and, in part because I see

20  these long Docket sheets before I've even come into the

21  case.

22           MR. CUNNINGHAM:  Yes.

23           THE COURT:  So, if you've got a problem turning

24  that stuff over, then we can talk about that, but I'm urging

25  that you do the accounting research.

1          MR. CUNNINGHAM:  Yes, and that's in process right

2    now.

3          THE COURT:  Okay.  Did you want to comment back?

4          MS. WOLFSHOHL:  Yes, I'd just like to explain in

5    part, Judge, you know, our disclosures also depend upon

6    their disclosures as to what they have received, because we

7    fully anticipate that some of the attorneys are going to

8    claim that they weren't the initial transferee, that really,

9    "I just money to pass on to this other attorney and he was

10   the initial transferee," and so I think that part of this is

11   that the disclosures are --

12         THE COURT:  Which is a little different from what

13   Mr. Cunningham is articulating.

14         MS. WOLFSHOHL:  -- dependent upon where the -- I

15   just think it's the other side of the coin, yes.

16         THE COURT:  Yeah, it is.

17         Okay, did you want to comment here in similar

18   1:37:40, or?

19         MR. TOWBER:  Your Honor, we are the person that

20   they allege got the funds, pretty much, so we, of course,

21   have a defense of a conduit theory, which is the defense

22   standing on an avoidance action that we --

23         THE COURT:  But didn't some of the money rest with

24   your --

25         MR. TOWBER:  Yes, it did, and we went out and we

1   had to pay the private investigators.  We had to pay the

2   other attorneys so, again, we did not maintain control over

3   the money.  We had a duty to forward that.

4            THE COURT:  Okay, who retained the private

5   investigator?

6            MR. TOWBER:  Your Honor, I do not know.  I will

7   have to look into that.

8            One of our major defenses, we believe, is that

9   Brown Medical Center, while it's not in the complaint, was a

10  party to the divorce proceeding.  They appeared at many of

11  the fee hearings in front of the Master and Chancery.  They

12  received a benefit from the payment of those fees because

13  Mr. Brown was able to run the companies.  There were

14  receivership motions that would have put these companies out

15  of business and also even if the BMC got the benefit from

16  him not being in jail and from them keeping on operating, so

17  that would be one of our, you know, major defenses.

18           Also, in terms of insolvency issue, we need to see

19  what they are relying upon because it is our understanding

20  that those businesses were booming businesses at the time.

21  Nobody was aware that they were not.  I don't believe

22  attorneys would have been fighting over this wealthy

23  business or cash-generating business if they felt that it

24  was not operating at a profit, so those are some issues that

25  we'd like to see disclosures on.

1          We'd like to see the disclosures first and then

2    reply maybe 10 days after their disclosure since they are

3    the Plaintiff and they have the burden on the issues.

4          THE COURT:  Well, on the transfer to a third party

5    theories, it seems to me you know what you got from BMC, and

6    to the extent that you were a conduit, I don't think you

7    need more disclosures if you know there's a universe of

8    money that BMC paid or -- right?

9          MR. TOWBER:  Yes, Your Honor, but that's an issue

10   in the case, as Mr. Cunningham said.  Did the monies come

11   from BMC or did they come from the Court registry or did

12   they come from Mr. Brown individually?

13         THE COURT:  Did BMC pay money into the Court

14   registry?

15         MS. WOLFSHOHL:  I don't believe BMC paid any money

16   into the Court registry.  BMC did pay Mr. Indelicato, and

17   then, BMC also made payments directly to primarily Marshal

18   Davis Brown.

19         And so there's payments going to various places,

20   and we can disclose where the initial payment went, but, you

21   know, Mr. Towber is already articulating the defense I was

22   discussing, which is, "We were just a conduit for these

23   funds that went other places."

24         THE COURT:  Yes.

25         MS. WOLFSHOHL:  And so, as to who was the initial

1  transferee?  It depends upon who had control of those funds

2  and where those funds were to be allocated, so it could have

3  been that even though BMC paid Marshal Davis Brown, the

4  person who actually asserted control over it was, you know,

5  another one of the attorneys that's in the case.

6           THE COURT:  Okay, well, anyway, to the extent that

7  you think you need discovery or initial disclosures of this

8  accounting from the Plan Agent, I'll defer your initial

9  disclosures to that extent, but I need to tell you that even

10 if you are not a Defendant, your people are subject to

11 discovery under Rule 45, or under party discovery.

12          MR. CUNNINGHAM:  We understand.

13          THE COURT:  And so I don't really -- I'm thinking

14 frankly that you better start gathering anything and

15 everything and not rest on this 10-day grace period.

16          MR. CUNNINGHAM:  We're in the process of getting

17 everything we can.

18          THE COURT:  Yes.

19          MR. CUNNINGHAM:  This divorce lasted a couple of

20 years and there were bankruptcies in Florida and

21 bankruptcies in Texas.

22          THE COURT:  Yes.

23          MR. CUNNINGHAM:  There were restructuring

24 officers.  I mean, there's going to be a lot of this.

25          THE COURT:  Restructuring, what?

 1          MR. CUNNINGHAM:  Officers.  There was a CRO
 2  appointed by the -- initially, the bankruptcy was in
 3  Florida.
 4          MS. WOLFSHOHL:  As to Dr. Brown, individually,
 5  only.
 6          MR. CUNNINGHAM:  Right, but the CRO was appointed
 7  to restructure his businesses, including BMCI.
 8          THE COURT:  He may have been doing it for that
 9  purpose, but did he accomplish anything during the period of
10  the bankruptcy?
11          MR. CUNNINGHAM:  Well, he worked awful hard, and
12  there was a period of time when he got frustrated and said,
13  "I quit," and then came back in, so it's complicated but,
14  yes, he did a whole lot of work, and there will be a lot of
15  evidence about what Brown Medical Center's situation was
16  during that period.
17          THE COURT:  Okay.  When you say, "He did a lot of
18  work," just fill me in.  What are you talking about?
19          MR. CUNNINGHAM:  Essentially -- again, it's
20  complicated, but essentially, Dr. Brown was operating hand
21  surgery centers and he was -- the gross income was enormous.
22          THE COURT:  Spending dominated.
23          MR. CUNNINGHAM:  And he was spending a lot as
24  well.
25          THE COURT:  Right.

1     MR. CUNNINGHAM:  And part of the problem was that
2  they wanted -- Dr. Brown wanted to make sure that he
3  retained as much control as he could over his companies.  He
4  actually, after filing the bankruptcy in Florida, he went
5  back and said, "I really didn't mean it. We're doing just
6  fine. I filed it because, in effect, I wanted to King's X,
7  the divorce, which means, obviously bankruptcy Judges and
8  family lawyers fight over who gets to distribute the assets.
9  And that was a tactic that he employed and he ultimately
10  went back to the Bankruptcy Court in Florida and tried to
11  dismiss the bankruptcy.
12     During that period, a Chief Restructuring Officer
13  was appointed to try to gain a modicum of control over the
14  businesses so that Dr. Brown could be a hand surgeon and be
15  a promoter, which is what he did best, and somebody that had
16  more business sense could operate the businesses.
17     THE COURT:  It's still under the auspices of the
18  Bankruptcy Court in Florida?
19     MR. CUNNINGHAM:  That's correct.  He was appointed
20  by the Bankruptcy Judge ---
21     THE COURT:  Well, was the bankruptcy -- was
22  Dr. Brown doing business through more than one entity?
23     MR. CUNNINGHAM:  Yes, ma'am.
24     THE COURT:  What other entities?
25     MR. CUNNINGHAM:  Lots of them.

1           THE COURT:  Really?

2           MR. CUNNINGHAM:  Yes.  He had companies to -- he

3   had cars.  He had boats.  He had houses and most of them

4   were different companies.  He had leasing companies.  He had

5   a ranch.

6           MS. WOLFSHOHL:  And Judge to be clear --

7           THE COURT:  What does that have to do with this?

8           MS. WOLFSHOHL:  -- those were his personal

9   entities.

10           THE COURT:  Yes.

11           MS. WOLFSHOHL:  He had several personal entities

12   and in the Bankruptcy Court currently, Ron Summers is the

13   Trustee over the entities for Michael Brown, personally.

14           THE COURT:  Because that proceeding, or that

15   bankruptcy case was transferred here?

16           MS. WOLFSHOHL:  Yes, it was, you know, ultimately

17   Grange was unsuccessful in redoing any sort of restructuring

18   and so the --

19           THE COURT:  But was actual restructuring done?

20   That is where companies were merged or the like, or was he

21   developing a plan trying to coach Michael Brown to simplify

22   the --

23           MS. WOLFSHOHL:  It never was really clear because

24   Mr. Brown wouldn't let him really do anything.  Mr. Brown

25   had a plan to develop a separate entity called Pro-Med down

1  in Florida that was actually a competing business to BMC.

2  His petitions were all, at that point, directed towards

3  Pro-Med and not BMC and so they just never were able to

4  accomplish anything.

5          THE COURT:  Is BMC an entity, or was it an entity,

6  that is focused only in Texas or Houston?

7          MS. WOLFSHOHL:  BMC managed surgery centers around

8  the country, and so BMC, itself, was focused in Houston, and

9  then some of these other surgery centers were in places like

10  Nevada and San Antonio and Austin.

11          THE COURT:  Other BMC's auspice?

12          MS. WOLFSHOHL:  Yes.

13          THE COURT:  And legally -- ?

14          MS. WOLFSHOHL:  Yes.

15          THE COURT:  -- ownership?

16          MS. WOLFSHOHL:  Yes.  That's correct.

17          THE COURT:  Okay, so back to your reorganization

18  efforts by this person.

19          MR. CUNNINGHAM:  Right. General Grange.

20          THE COURT:  General Grange?

21          MR. CUNNINGHAM:  G-R-A-N-G-E.  He's a former army

22  general.  I forgot his first name, but everybody calls him

23  General Grange, and he operates a business that does this.

24          THE COURT:  To restructure?

25          MR. CUNNINGHAM:  Yes, ma'am.   And he presented

1  himself to the Bankruptcy Court with those credentials and

2  on that basis was engaged.

3          THE COURT:  Okay, so this table, I know a bunch of

4  these lawyers from way back.  I know you, too, but I know

5  several of you-all, but in my world, which is 20 years ago,

6  the last time I was at a firm, people who were engaged to

7  restructure generally did it under a Court Order.  I mean,

8  they didn't just get in there and have freedom of movement.

9  Now, I stand to be corrected, but I'm having trouble

10 understanding what this General Grange was doing if the

11 bankruptcy was still ongoing, and there was no plan to

12 replace --

13         MR. CUNNINGHAM:  Your Honor, the --

14         MS. WOLFSHOHL:  The bankruptcy down in Florida was

15 staid and at any point if its creditors felt like it wasn't,

16 the restructuring wasn't going well, they could --

17         THE COURT:  Was it an 11?

18         MS. WOLFSHOHL:  It was --

19         THE COURT:  A 13?

20         MS. WOLFSHOHL:  -- the individual bankruptcy case

21 was --

22         MR. CUNNINGHAM:  Chapter 11.

23         MS. WOLFSHOHL:  It was 11.

24         MR. CUNNINGHAM:  Yes, ma'am.

25         MR. TOWBER:  Yes, Your Honor.  What happened was,

1  was that the Court dismissed the case with conditions and

2  the condition was that the CRO was appointed.

3         THE COURT:  Oh.

4         MR. TOWBER:  And there was actually a Court Order

5  entered, which is very telling in this case, where the

6  entities, BMC, agrees to the jurisdiction of the Bankruptcy

7  Court and there's actually a provision in that Order, I

8  believe -- I haven't looked at it in a long time -- which

9  says that the parties understand that BMC is paying the

10  attorneys in the divorce, and the Court basically blesses

11  that procedure.  Now, I haven't looked at that --

12         THE COURT:  Okay, whoa.  Whoa.  Okay.

13         MR. TOWBER:  -- order in a long time, and we're

14  getting off topic, but I did want to bring -- so apparently

15  Michael Brown did not allow the CRO to operate properly so

16  the company -- the creditors came in and reopened the case a

17  year later, roughly a year later.

18         THE COURT:  Oh, but there was activity in the

19  interim by this General Grange?

20         MR. TOWBER:  Yes, there was.

21         MR. CUNNINGHAM:  The philosophy, Judge, was,

22  "We've got a great business.  Dr. Brown is off the tracks.

23  Let's put somebody in there who can keep it a great business

24  and make it grow, and keep it as solvent as it is."

25         THE COURT:  And manage the business side.  Was

1   Dr. Brown actually doing surgery at this point?

2          MR. CUNNINGHAM:  Oh, no.  He had lost his medical

3   license --

4          MS. WOLFSHOHL:  No, Judge, he had lost his medical

5   license --

6          MR. CUNNINGHAM:  -- a long time ago.

7          THE COURT:  That's what I thought.

8          MS. WOLFSHOHL:  -- years before.

9          THE COURT:  Okay.  Okay, so anyway, I've got a

10  little feel for this now.  It's a little better, but

11  punchline, you are saying that your clients were a conduit

12  by and large, at least to some extent.

13         MR. TOWBER:  Your Honor, we're saying that to the

14  extent that funds came from BMC, we're going to have TO show

15  what we got and what everybody else got --

16      (Both speaking.)

17         THE COURT:  Okay, and that's largely an accounting

18  conversation.

19         MR. TOWBER:  And we also say that when you say the

20  universe of funds that came from BMC, that's what is unclear

21  from the Complaint.  We'd like to --

22         THE COURT:  Right.  Right.  We all get that.

23         MR. TOWBER:  -- the universe of funds.

24         THE COURT:  And your situation is?

25         MR. CUNNINGHAM:  We've got no money from BMC,

1    none.

2              THE COURT:  Oh.

3              MR. CUNNINGHAM:  We've got money from -- our bills

4    were paid by David Brown.

5              THE COURT:  David Brown?

6              MR. CUNNINGHAM:  That's right.  Any legal fees I

7    think that are relevant to this case, we've got none of them

8    directly, and to the extent one can trace through David

9    Brown, that's where we're going to be because any money we

10   got, we got from David Brown.

11             THE COURT:  Okay, you want to comment back for any

12   reason regarding this --

13             MS. WOLFSHOHL:  I think that there may have been a

14   small amount -- a small direct payment, and, Judge, we will

15   disclose any direct payments but we already have that

16   information compiled.

17             THE COURT:  Are you --

18             MS. WOLFSHOHL:  Direct payments.

19             THE COURT:  I'm sorry about that interruption.

20             Are you trying to get money from Mr. Moffet or

21   Mr. Cunningham's other clients, Hoffman?

22             MS. WOLFSHOHL:  Yes, Judge.

23             THE COURT:  Because money was paid indirectly to

24   them through Indelicato or someone else?

25             MS. WOLFSHOHL:  We have to take discovery on that

1  issue, Judge.  The problem is that, you know, Mr. Towber is

2  already articulating his mere conduit defense.  He's saying,

3  "We were just a conduit for these funds."

4          And there's a case, *In re: Coutee* (phonetic) from

5  the Fifth Circuit that says, "Potentially if funds are held

6  in a lawyer's trust account, and then they don't have

7  control of those funds, and those funds are paid directly to

8  his client, that they are the initial transferee."

9          And so, we have to take discovery as to who had

10 control of these funds so that we can articulate who was the

11 initial transferee or the subsequent transferee.

12          THE COURT:  Okay.

13          MS. WOLFSHOHL:  And we are also able to sue the

14 subsequent transferee. Now, they may have different

15 defenses, and our complaint alleges that they are the

16 initial or subsequent transferee of the funds, and if his

17 client claims they didn't get them, I think that's fairly

18 easy to say, you know, "They had control, and we didn't get

19 any funds directly from you."

20          And so, I don't think it's difficult for them to

21 answer that.  I just think that they are going to have

22 conflicting positions on those issues, and we need to take

23 discovery as to those transfers.

24          MR. CUNNINGHAM:  But that's why we need their

25 disclosures to be able to work from because our disclosures

1   are going to be different to begin with.

2          MS. WOLFSHOHL:  And I assume Mr. Towber's

3   disclosures will look completely different than that, and

4   so, you know, we're happy to disclose where we think the

5   funds went, who, you know, who BMC transferred the funds

6   directly to, and later on we may be able to supplement those

7   disclosures once the parties take position over who had

8   control over the funds.

9          THE COURT:  When you've done your discovery, okay.

10  But your people got money for services rendered from

11  somewhere?

12         MR. CUNNINGHAM:  Correct.

13         THE COURT:  For services rendered for either

14  Rachel or Michael Brown.

15         MR. CUNNINGHAM:  We represented Rachel Brown.

16         THE COURT:  Rachel.

17         MR. CUNNINGHAM:  Yes, ma'am.

18         THE COURT:  Okay, Rachel Brown, so --

19         MR. CUNNINGHAM:  But Mike Brown was ordered to pay

20  her fees.

21         THE COURT:  Okay, so Rachel Brown's fees,

22  attorney's fees, were being paid by someone --

23         MR. CUNNINGHAM:  Correct.

24         THE COURT:  -- and you can track now who paid each

25  portion?

1          MR. CUNNINGHAM:  We can do that.  We can track

2   that.

3          THE COURT:  Okay.  And so you will need to do that

4   whether it is important --

5          MR. CUNNINGHAM:  Understood.

6          THE COURT:  -- or not important.

7          MR. CUNNINGHAM:  And we are doing that.

8          THE COURT:  Okay.  Fair enough.  That's great.

9   Okay, that helps me there.

10          Now, is there anything else on this case, Guffy

11   versus Brown?

12          MS. WOLFSHOHL:  Judge, are you going to go through

13   and are we going to establish the various deadlines for --

14          THE COURT:  We are.

15          MS. WOLFSHOHL:  -- the parties and I don't know if

16   you want to do that at this time or?

17          THE COURT:  We're going to do it after I've heard

18   from the others because I'm hoping -- well, we can talk

19   about whether the deadlines should be the same or different

20   in the two different cases, okay?  But I would like to get

21   the lay of the land, factually, and I need more detail than

22   the pleadings.

23          MR. CUNNINGHAM:  I would raise one issue briefly,

24   Your Honor, and it concerns our answer.  We filed an answer

25   in this case.  While it was in Judge Bohm's Court, everybody

1    filed Motions to Withdraw the Reference and everybody filed

2    Motions to Dismiss by the State. And it was subsequently

3    corrected by an Order from Judge Bohm, in which he basically

4    said, "I did the wrong thing.  I signed" -- he entered an

5    order denying our Motion to Dismiss because the protocol

6    that had been set up was he'll rule on Motions to Withdraw

7    the Reference before considering the Motions to Dismiss, and

8    then something happened, and he signed an Order, which we

9    said, "Judge, I thought we were going to do the Motions to

10   Withdraw the Reference, first."

11          But in the meantime, we felt we were obligated to

12   file an answer, and so we got an answer on file.  But we're

13   going to ask leave of Court to amend that answer at the

14   appropriate time, either now or later by --

15          THE COURT:  You're going to have -- you'll have

16   time to amend, no problem.

17          MR. CUNNINGHAM:  Thank you.

18          THE COURT:  We're definitely going to give you

19   time to amend.  I want that time to amend to be after the

20   initial disclosures.

21          MR. CUNNINGHAM:  We agree.  Thank you.

22          THE COURT:  Okay.  But I don't want another Motion

23   to Dismiss, if I can avoid it.

24          MR. CUNNINGHAM:  We agree with that, too, Judge.

25          MR. TOWBER:  Your Honor, I'm sorry, and we haven't

1 answered yet, so we need a date to answer or else we can

2 answer --

3            THE COURT:  Well, I think you just pick one.

4            MR. TOWBER:  Okay.  We can.

5            THE COURT:  That's not part of my form, and

6 frankly that's so you will all answer or else there could be

7 consequences later, but I expect Counsel that you can agree

8 on that.

9            MR. TOWBER:  Thank you, Your Honor.

10            THE COURT:  Okay.  The criminal case or cases.

11 Yes.  Are you?

12            MR. PHILLIPS:  Judge, I'm with the criminals.

13       (Laughter in the courtroom.)

14            MR. PHILLIPS:  But we handled the divorce.

15            THE COURT:  Okay.  Then, let's hear from you?

16            MR. PHILLIPS:  Basically, --

17            THE COURT:  I wasn't sure why they put you in that

18 case.

19            MR. PHILLIPS:  Pardon?

20            THE COURT:  I wasn't sure why the Plan Agent put

21 you in the criminal case.

22            MS. WOLFSHOHL:  I can respond to that if you let

23 me, Judge?

24            THE COURT:  Yes.

25            MS. WOLFSHOHL:  We initially drafted the Complaint

1  as to DeGuerin.  BMC made a bunch of transfers to DeGuerin,

2  and I believe the funds in that case were all directly to

3  Mr. DeGuerin or his firm.

4          Subsequently, Mr. DeGuerin's spreadsheet said,

5  "These funds are not for us.  We were not the initial

6  transferee.  The initial transferee is really all the other

7  Defendants that have been named in this case, and here's the

8  amounts they got."

9          And so like this case, in that case, they are also

10  alleging that they were not the initial transferee, that

11  there was an initial transferee and they were just the mere

12  conduit for these funds, and so his client received funds

13  through DeGuerin because apparently Mr. DeGuerin was also

14  working on some of the divorce case because there were some

15  criminal allegations.  I think there was an allegation that

16  Rachel Brown was abused, and so I believe that they brought

17  in --

18          THE COURT:  DeGuerin?

19          MS. WOLFSHOHL:  Yes.  So they brought in

20  Mr. DeGuerin and also divorce counsel to assist in those

21  efforts, and so the reason why he's part of that case is

22  because Mr. DeGuerin said that he paid Ms. Scardino from the

23  funds that were received that were received from BMC.

24          THE COURT:  Okay, Scardino and DeGuerin were

25  together?

1          MS. WOLFSHOHL:  Yes.

2          THE COURT:  At the time as partners?  Or were they

3   just both --

4          MS. WOLFSHOHL:  No.  Working together.

5          THE COURT:  -- they were joint counsel?

6          MS. WOLFSHOHL:  Paying -- Mr. DeGuerin was

7   assisting, I guess, with the divorce case in some way and he

8   brought in Ms. Scardino to assist in those efforts and

9   apparently was paying her for her services from funds

10  received from BMC.

11         THE COURT:  All right.

12         MR. PHILLIPS:  But all her services --

13         THE COURT:  All right.  Who do you represent

14  again?  I'm sorry.

15         MR. PHILLIPS:  I represent Katherine Scardino.

16         THE COURT:  All right.

17         MR. PHILLIPS:  And all of her payments were for

18  services she performed in the divorce case.

19         THE COURT:  Right.  Okay.

20         MR. PHILLIPS:  And then she was let go after a

21  certain period of time.  I think December of 2011, and

22  performed no more services.

23         THE COURT:  December 2011, okay.  And so she

24  preceded DeGuerin's work or overlapped?

25         MR. PHILLIPS:  Mr. DeGuerin asked her to assist or

1   to handle the divorce case during the period of time when

2   she was representing Mr. Brown.

3          THE COURT:  Oh, she represented Mr. --

4          MR. PHILLIPS:  And that's what she did solely was

5   divorce work.

6          THE COURT:  What was she representing Mr. Brown in

7   initially?

8          MR. PHILLIPS:  Pardon?

9          THE COURT:  What was she representing Mr. Brown

10  in?

11         MR. PHILLIPS:  In the divorce case.

12         THE COURT:  Only the divorce case.

13         MR. PHILLIPS:  On the other side of David Brown

14  and Rachel Brown.

15         THE COURT:  Yes.  Okay, I didn't know she did

16  divorce work.  Okay.  Got it.

17         MR. PHILLIPS:  Thank you, Judge.

18         THE COURT:  Who wants to comment now?

19         MR. LEYH:  I will, Your Honor.  Steve Leyh on

20  behalf of Dick DeGuerin.  We're going to be asserting some

21  similar defenses that Mr. Towber articulated:  Trust fund

22  theory, mere conduit, Dr. Brown directed the payment of

23  these funds, that there was a benefit to Dr. Brown and BMC,

24  that all he, perhaps, he and all of his entities are one and

25  the same.

1           THE COURT:  Well, I was wondering about that.  Is

2   anybody arguing some sort of alter ego piercing?

3           MR. LEYH:  Yes.  To me, the big issue here is

4   going to be the insolvency.

5           THE COURT:  Oh.

6           MR. LEYH:  I don't think it's a foregone

7   conclusion.  I have seen documents that say in 2011, they

8   billed $500 million and collected over $100 million.  So,

9   even with spending habits like Dr. Brown's, you might could

10  stay up on top.  On that note, the insolvency --

11          THE COURT:  Oh, remind me, remind me.  Insolvency

12  can be proven by an asset liability calculation or is it

13  cash?

14          MS. WOLFSHOHL:  There's multiple --

15          THE COURT:  You know, not having cash--

16          MS. WOLFSHOHL:  -- yes, there's multiple different

17  ways that assets versus liabilities is the key method, and

18  Judge, actually you already have our insolvency report in

19  this matter demonstrating insolvency as of March 2011,

20  because there are several other matters that we needed to

21  use it for, so we're confident in insolvency.

22          And then there's also, as you mentioned, the

23  cash-flow method, not being able to pay debts as they come

24  to you, and that's also going to be part of the insolvency

25  report in this matter.

1          THE COURT:  Have you seen that report?

2          MR. LEYH:  No, I have not.

3          MS. WOLFSHOHL:  We haven't taken any discovery to

4     the reference being withdrawn, and Judge Bohm actually told

5     us, "Do not go forward in discovery until this is all

6     resolved."

7          THE COURT:  Right, but you do have the reports

8     that will be part of your initial disclosures?

9          MS. WOLFSHOHL:  Yes.

10         THE COURT:  Okay, so you're challenging

11    insolvency.  You are challenging, you may, or to some degree

12    or maybe wholesale challenge the sanctity of the corporation

13    that it's piercing?

14         MR. LEYH:  Yes.

15         THE COURT:  Or alter ego.  And then also that you

16    didn't agree?

17         MR. LEYH:  Trust funds, conduit.

18         THE COURT:  Correct, conduit.

19         MR. LEYH:  Brown directed the payment, and some of

20    the payments did go to my client, and we can demonstrate

21    that.

22         THE COURT:  Okay, so, well, that's helpful.  Do

23    you want comment anymore?

24         MS. WOLFSHOHL:  Sure, Judge, I just want to talk

25    just a little bit about value and the theory that, you know,

1   Dr. Brown and BMC were one and the same.

2          Dr. Brown and BMC at this point were at odds with

3   one another.  He was engaged in several criminal matters and

4   he was basically just, you know, robbing the company blind,

5   and, you know, we've said several times, every day,

6   Mr. Brown was in jail, it was actually a better day for the

7   company because he wasn't consistently taking money from the

8   company for his New York apartments and yachts down in

9   Florida and everything else.

10          And also, there's this Pro-Med Company that he was

11  establishing down in Florida, so he was actually, you know,

12  breaching his fiduciary duty to BMC and attempting to set up

13  shop elsewhere, so we don't believe that any value given to

14  Dr. Brown is value to BMC.

15          The Fifth Circuit has also said that value to BMC

16  for the purpose of fraudulent transfer was to be valued from

17  a creditor's perspective.

18          From a creditor's perspective, services, rendered

19  in connection with his criminal matters is not value to BMC,

20  so I just wanted to address that because --

21          THE COURT:  It's creditors of BMC?

22          MS. WOLFSHOHL:  Of BMC, correct.

23          THE COURT:  Okay, that's helpful.  Anything else?

24          MR. LEYH:  No, ma'am.

25          THE COURT:  Any recent urgent collection or

1  foreclosure cases?

2          MR. LEYH:  Always.

3          THE COURT:  I was just kidding.

4      (Laughter in the courtroom).

5          THE COURT:  This man is showing up in Court all

6  the time with those cases.  Okay, thank you.

7          MR. LEYH:  You bet.

8          THE COURT:  Yes?

9          MR. JOHNSON:  Peter Johnson.  I represent Brian

10  Wice and Cathy Bennett Associates.  These were two parties

11  that assisted Mr. DeGuerin in the criminal trial.  Mr. Wice

12  was there assisting Mr. DeGuerin.

13          THE COURT:  Remind me, did the case go to trial,

14  the criminal case?

15          MR. JOHNSON:  Yes.

16          THE COURT:  Is that how he wound up --

17          MR. JOHNSON:  Right, that's correct.  That would

18  have been in probably in August of, I think, in August of

19  2011, within that time period.  And so, we're particularly

20  concerned about insolvency going back that far.

21          THE COURT:  Right.

22          MR. JOHNSON:  Because we're defending the claims

23  against these transfers that were made or the payments that

24  were made to both Cathy Bennett and Associates who was the

25  jury consultants as well.

1           And so, other than the defenses that have been

2      raised so far, I think, we'll fall within those defenses as

3      well, but even more so as regard to the money that my

4      clients were paid, we are going to be defending by the fact

5      that they received those monies from Mr. DeGuerin.  They

6      didn't receive them from Dr. Brown and the conduit theory we

7      are going to defend against Mr. DeGuerin asserting that for

8      the reason that -- and we don't this yet because we don't

9      know what his agreements were with Dr. Brown, but we believe

10     that he had dominion and control over the money, and I think

11     that's a critical factor when he treated us as a subsequent

12     transferee.

13           THE COURT:  Who hired your clients, you know, with

14     their contract?

15           MR. JOHNSON:  Mr. DeGuerin is the one that sent

16     them both, the contracts, that's where it's between the two

17     of them, even though they knew they were there because

18     Dr. Brown was in charge.

19           THE COURT:  Dr. Brown was ultimately the Defendant

20     in the case.

21           MR. JOHNSON:  That's correct.

22           THE COURT:  But often defense attorneys in both

23     civil and criminal hire the experts.

24           MR. JOHNSON:  Right.

25           THE COURT:  For a variety of reasons.

1          MR. JOHNSON:  They believed they were being hired

2   by Mr. DeGuerin.

3          THE COURT:  No, written contracts?

4          MR. JOHNSON:  I think there was a jury contract.

5   I believe there is one but the idea was that the money that

6   came to them was given to them by Mr. DeGuerin and a

7   critical issue I think is part of the discovery is to find

8   out what the agreement was that Mr. DeGuerin had with

9   Dr. Brown.

10          THE COURT:  Right.  I agree with that.

11          MR. JOHNSON:  But that's where we stand with all

12   the other defenses as well.

13          THE COURT:  How long has this case, your case,

14   been pending?  I guess I should ask you?

15          MS. WOLFSHOHL:  September of 2015, I believe, is

16   when the case was filed.

17          THE COURT:  Okay, great.  All right, thank you.

18          MR. JOHNSON:  Thank you.

19          THE COURT:  Next?

20          MS. KEHLHOF:  Your Honor, Joan Kehlhof. I

21   represent Moritz and Associates, Inc.  They are a private

22   investigators' firm.  They were hired by Dick DeGuerin, not

23   by Dr. Brown.  They never met with Dr. Brown.  All their

24   money came from DeGuerin and Associates and so we're

25   claiming to be immediate transferee that took for good value

1  and in that sense, we have a defense against the transfers

2  that were made to my client.

3          THE COURT:  How much were they roughly, do you

4  know?

5          MS. KEHLHOF:  About $330,000. There's an --

6  attached is an exhibit to the amended complaint is a list of

7  some of the transfers.  I've asked my client to look at it

8  and tell me if it's full and accurate but I don't know yet.

9          THE COURT:  Okay.

10         MS. KEHLHOF:  But if we don't prevail on the

11  transferee issue because in bankruptcy if your immediate

12  transferee and you take for good faith, you have a defense

13  against the money being returned.

14         THE COURT:  You just have to show value.

15         MS. KEHLHOF:  Yes.  And gained value for the

16  services.

17         But if we don't prevail on that, we are going to

18  have to go back to the benefit, insolvency, the similar type

19  issues that everybody is bringing up here because we believe

20  there was a benefit to the Brown Medical Center Estate

21  because it wasn't closed for a substantial period of time

22  because Dr. Brown wasn't put in jail.  We also believe that

23  they're --

24         THE COURT:  Say that again?

25         MS. KEHLHOF:  Dr. Brown, if he had been put in

1    jail, the BMC would have been shut down immediately.

2              THE COURT:  He was put in jail because he was on

3    bond.

4              MS. KEHLHOF:  Right.

5              THE COURT:  Before the trial, and after.  Was it

6    after the trial, when he was --?

7              MS. KEHLHOF:  Yeah, he prevailed.

8              THE COURT:  Oh, he was acquitted?

9              MS. KEHLHOF:  I believe that's right.

10             THE COURT:  Oh, okay, so when was -- what's the

11   reference to jail?

12             MS. KEHLHOF:  If he had lost, he would have gone

13   to jail.

14             THE COURT:  But he was in jail at some point,

15   wasn't he?  Did someone say he was in jail?

16             MS. WOLFSHOHL:  He was jailed a number of times,

17   Judge, and there were several different criminal matters

18   during the insolvency period that were raised.  I don't

19   think -- I think he was acquitted in this matter and then

20   there was a later matter with a stewardess that's not

21   connected but --

22             THE COURT:  Right.

23             MS. WOLFSHOHL:  There were several.

24             MR. CUNNINGHAM:  The jail was because he wouldn't

25   follow the family Court's orders to pay fees --

1            THE COURT:  Oh, stop?  Really?

2            MR. CUNNINGHAM:  -- discovery, and she put him in

3    jail and let him sit there.

4            THE COURT:  So it was civil or criminal contempt?

5            MR. CUNNINGHAM:  Family -- at that point.

6            MS. KEHLHOF:  He was jailed for other things other

7    than this criminal matter that my client worked on.

8            THE COURT:  Was yours the marijuana matter?

9            MS. KEHLHOF:  Yes.  And I think the --

10            THE COURT:  What was his defense -- I'm just out

11    curiosity.  What was his defense in the marijuana matter

12    irrelevant to this proceeding, I recognize that.  I didn't

13    know it was there because I had so much land?

14            MR. CUNNINGHAM:  I wasn't there, but I am sure it

15    was medical.

16        (Laughter in the courtroom.)

17            THE COURT:  Okay.  But without a license.

18            MS. KEHLHOF:  We think there was a benefit to the

19    Estate because he was not put in jail as a result of this,

20    and the Medical Center was able to continue operating as a

21    result.  There is a just a number of different -- we think

22    our best defense is the immediate transferee, but if we lose

23    on that, we're going to just have to fall back on the whole,

24    you know --

25            THE COURT:  All right, well, they are going to be

1   doing it anyway, so.

2          MS. KEHLHOF:  Yeah.

3          THE COURT:  That's fine. Mr. Cowgill?

4          MR. COWGILL:  Your Honor, you heard the pieces on

5   both --

6          THE COURT:  Who do you represent?  Excuse me,

7   again.

8          MR. COWGILL:  Mr. DeGuerin.

9          THE COURT:  Oh, you are also.

10          MR. COWGILL:  Yeah, we're together.  If you don't

11   mind, then I'd like to make a comment to you.

12          THE COURT:  No, I'm all ears.

13          MR. COWGILL:  Okay.  You heard the pieces of both

14   cases.  The overall view, from Mr. DeGuerin's standpoint,

15   during the time period he was hired was to keep Dr. Brown

16   from going to jail because everyone agreed if Dr. Brown went

17   to jail, the company would collapse, and so that's why

18   Mr. DeGuerin hired people to represent Dr. Brown so that he

19   would have some influence and access to the people so that

20   the divorce lawyers and the other lawyers wouldn't carry

21   Dr. Brown into an area that would cause him to go to jail.

22          THE COURT:  This is a bit of background, but I'm

23   curious to know if he had a corporation, BMC, Inc., and he

24   was not doing the surgeries because he was the national

25   franchise or nationally operating. He was the head, or I

1  don't know what his title was, of this nationally operating

2  entity, could the entity have operated without his

3  involvement?  He was a titular head is what I'm thinking.

4          MR. COWGILL:  I understand your question, and the

5  answer is, let me say, I hate to say "yes and no," but yes

6  and no. He was a brilliant surgeon, and he created the

7  procedures.

8          THE COURT:  Yes.

9          MR. COWGILL:  And so everyone utilized his

10  procedure.  All the clinics did.  They could actually do a

11  hand procedure in 15 minutes.

12          THE COURT:  Okay.

13          MR. COWGILL:  And they did probably 20 to 30 a

14  day.

15          THE COURT:  At each location?

16          MR. COWGILL:  Well.

17          THE COURT:  But they were different doctors?

18          MR. COWGILL:  Yes, yes.

19          THE COURT:  Okay.

20          MR. COWGILL:  So, as to whether he was there and

21  counseled them or advised them, I don't know.  But the main

22  emphasis for BMC was if something happened to Dr. Brown, if

23  he went to jail, and Mr. DeGuerin kept him from going to

24  jail during Mr. DeGuerin's service period that these clinics

25  would all die instantly.

1          THE COURT:  Okay, just one second.  Okay, I see

2    several people standing.  I have a problem.  I didn't dream

3    this was going to go on so long, and this is completely my

4    fault, but I have a conference call that is going to take

5    about 15 minutes at 2:15, which is in five minutes.

6          MR. COWGILL:  Take it.

7          THE COURT:  I would like to please hand you each,

8    each team I should say, a copy of the proposed or the form

9    order I use for scheduling purposes and let you work on

10   deadlines.  I did not get from you because I guess either we

11   didn't ask or it's not typically your pattern to submit a

12   joint report that tells me some of the dates that you might

13   recommend.  I always go through the dates with the parties

14   anyway, but, Sheila, I only have one for Davis.

15         MS. WOLFSHOHL:  Judge, I had actually prepared

16   those in the event of a hearing.

17         THE COURT:  Okay.

18         MS. WOLFSHOHL:  With my proposed dates, which I

19   received one or two comments on but I can circulate this and

20   we can discuss it.

21         THE COURT:  Well, that would be helpful.  What I

22   would really like to do is take the break I need.  It's a

23   conference call with another Judge and some staff in

24   Washington, so I'm stuck.

25              I would appreciate if you would go through this

1  form with Ms. Guffy and see if you can reach an agreement.

2       Let me just tell you a couple of guideposts, if

3  you will.  I would like a schedule that is real, so figure

4  out how much discovery you really think you need and then

5  that will be the deadline for discovery. The experts need to

6  be within that period, and leave to amend and adding new

7  parties, same thing.  It's usually chronological, up through

8  the close of discovery.  We are not doing expert discovery

9  segregated from fact discovery, just pick a global end of

10 discovery date.

11       I don't mind if you need more time if you can

12 agree. Otherwise, you'll have to come see -- file a letter

13 and you'd come see me, but I want to move these cases, and

14 it sounds like the Plan Agent does have a lot of the

15 analysis done that you are going to get the benefit of, so,

16 that's not to say she can't change it, but it is to say that

17 you are going to be moving ahead promptly.

18       Then, we get to motions and ADR and regarding

19 motions, you can file them whenever you want but the outer

20 limit is the deadline in paragraph 6 of this form order.

21       Typically, I expect Motions for Summary Judgment

22 to be at the close or just after the close of discovery, but

23 if there is some interim measure, interim-type motion that

24 might get you out of the case completely, then so be it.

25 You can file a motion early.  But I'm looking for the end

1   date, last date.

2          Other pre-trial motions is generally Daubert

3   motions, but may be something else.

4          To the extent summary judgment motions are filed

5   and you object to evidence the opponent is using, you just

6   file objections.  We do not need separate motions, so you

7   don't worry about the motion date.  Just summary judgment

8   motion is filed on the last day.  That's fine.  And

9   objections to the evidence can be filed and you can go back

10  and forth on that, but objections to the evidence is not a

11  separate motion.

12         I guess there are going to be a lot of motions

13  filed or at least some, and so you have to assume it will

14  take you a month to brief the motions.  That's three weeks

15  for response and one week for a reply.  If you agree and

16  wanted it certified, that would be another week.  That would

17  be the typical briefing period.

18         If you intend to make those briefing periods

19  longer, then you are going to affect the next deadline,

20  which is the joint pretrial order deadline.

21         I do not want a joint pretrial order submitted

22  until the motions have been decided. Usually, I give myself

23  two months to decide motions.  Because there are so many and

24  I am sort of assuming, I am going to handle these two cases

25  in tandem, I'm going to ask for three months from the time

1  you think you are going to finish briefing to the joint

2  pretrial order deadline.  If I can, I should make that, but

3  if I can't make that, then I would have to extend the joint

4  pretrial order date myself.   The good news is I can extend

5  when I feel like it. But I try not to.  I try to put you

6  under deadlines, and I try in fairness to keep myself under

7  deadlines.

8        So, joint pretrial order can be due no sooner than

9  three months after you think you're going to finish briefing

10  the motions, which could be four weeks, six weeks, after the

11  motion deadline.  Okay?  And then I'll fill in the Docket

12  call once I see what you've got.

13        And I should be back out here in 15 or maybe 20

14  minutes.

15        MS. WOLFSHOHL:  Judge, sometimes it's helpful to

16  be able to work backwards to file some of the other

17  deadlines.  I mean, do you have an end date in mind for the

18  trial?  Would it be mid-17?

19        THE COURT:  No.

20        MS. WOLFSHOHL:  No, okay.

21        THE COURT:  Well, in the real world, the trials

22  occur within the month of the, within a 30-day period,

23  sometimes a lot sooner, of the joint -- strike that, of the

24  Docket call.  So, by picking the Docket call which is

25  usually, okay -- the joint pretrial order is going to be

1  filed.  Generally, it would be 10 days/2 weeks, I'd have a

2  Docket call, okay?

3        And from that Docket call, the trial -- I don't

4  know if I'm trying these separately or together, but

5  generally it would be within the month after the Docket call

6  that I would have the trial.

7        I do not give a trial date because anything could

8  happen between now and the end of 2017, which is what I'm

9  suspecting you have in mind here.  Mid -- you know, I would

10  not be surprised if you said we need nine months or

11  something for discovery, maybe a little bit more.  I don't

12  know.

13        MS. WOLFSHOHL:  I don't think we need that much,

14  Judge, but I can go talk to the lawyers.

15        THE COURT:  Well, we'll see what they have to say.

16  But let's call it 9 months just for argument's sake.  Then,

17  it is still a month after that you'd file your motions, and

18  then another month is briefed, and then I need three months,

19  and then I need another month.

20        MS. WOLFSHOHL:  And then at that point you would

21  set the trial?

22        THE COURT:  Right, and so but when I give you the

23  trial date, it's real, and you know we can talk about

24  engagement letters and all that some other time, but the

25  point is, I'm not going to set it the two weeks at Christmas

1   time, I can promise you that.

2          But I don't think this case is going to get tried

3   until mid-2017, give or take a little.

4          If you could do your discovery in six months, that

5   would be great, terrific if you think -- it sounds like a

6   ton of this overlaps, and if the Trustee, the agent, has

7   done a lot of work already, then you will get those reports

8   and some of the delay will have been mediated right there.

9          So, does that answer your question, give or take?

10          MS. WOLFSHOHL:  Yes.

11          THE COURT:  Okay, thank you-all.  I'll be back

12   out.

13       (Recess taken from 2:19 p.m. to 2:50 p.m.)

14          THE COURT:  Sorry.  Please be seated.

15          All right, where do we stand?

16          MR. CUNNINGHAM:  Your Honor, we've got some out in

17   the hall.  May I tell them to come in?

18          THE COURT:  Sure.

19          MS. WOLFSHOHL:  I'll go get them.  I'll go.

20          MR. CUNNINGHAM:  We have an agreement.

21          THE COURT:  Great.  Case over.  I'm going to close

22   these babies.

23       (Laughter in the courtroom.)

24          MS. WOLFSHOHL:  There's one point that we need to

25   discuss.

1          THE COURT:  Okay, I'm happy to discuss any and all

2    points.

3          MS. WOLFSHOHL:  Okay, I think that -- well, do you

4    want us to go through the dates first and we can discuss the

5    part that we're not agreed, so that you can tell us whether

6    you think these dates are in line with --

7          THE COURT:  Tell me what the issue is you are not

8    agreed on?

9          MS. WOLFSHOHL:  The issue that we're not agreeing

10   on is the presentation by the defendants of the solvency

11   expert.  We discussed that we have our solvency obtained.

12   We can disclose with our initial disclosures is the key

13   issue in the case, and I don't want the Defendant's deadline

14   to be in November.

15         THE COURT:  So, late?

16         MS. WOLFSHOHL:  Yes.

17         THE COURT:  Because you --

18         MS. WOLFSHOHL:  If I disclose that early, it's

19   unfair to have such a delay for disclosure for the response

20   of experts, and so I, you know, it's a fairly complicated

21   issue, but I wouldn't think that more than 45 or 60 days

22   would be necessary to designate a responsive expert.

23         THE COURT:  Okay.  But don't they need a bunch of

24   discovery?  I mean, you've been living with this for a

25   while, haven't you?

1           MS. WOLFSHOHL:  Well, we already have the

2   documents that support that opinion together to produce, so

3   we would be producing both the opinion and the responsive

4   document, the tax returns and, you know, all the documents

5   that make up that opinion.

6           THE COURT:  Okay, let me ask the Defense.  Are you

7   going to do a joint effort here, or are each of you going to

8   do your own?

9           MR. CUNNINGHAM:  Your Honor, we are not, and I

10  heard you say earlier that -- well, I think we are, I mean

11  we are not planning on it --

12          THE COURT:  What you are not going to do a joint

13  effort on insolvency?  I was only speaking to insolvency.  I

14  was not clear.

15          MR. CUNNINGHAM:  Okay, really haven't even

16  considered it.  I suppose we could try.

17          MR. LEYH:  Are you speaking of the joint effort

18  between the two adversary proceedings or between all

19  Defendants or something --?

20          THE COURT:  Or some combination thereof, yes.  I

21  was thinking that insolvency is an issue that all of the

22  Defendants have an interest in, and in my humble experience,

23  insolvency is expensive to analyze, particularly in light of

24  some of what I've heard today, and so I was wondering if

25  there is going to be a joint effort.

1          That does not mean you can't hire your own expert

2   if you fall off the collective train, but I mean, look,

3   you've got deep pockets, guys.

4          MR. CUNNINGHAM:  Well, we don't, Judge, for this

5   reason.  We represent lawyers who work by the hour and we

6   really don't have deep pockets.

7          THE COURT:  Okay, well, then there you go.  So,

8   anyway, my point was going to be, I do think,

9   notwithstanding Ms. Guffy's comments, I think that you are

10  entitled to a meaningful amount of time to review the

11  documents from the bankruptcy and the financial records, but

12  it is advantageous to efficiency to have fewer experts

13  fumbling over the same papers or whatever and coming up with

14  their own reports.

15         MR. LEYH:  To briefly answer your question, Your

16  Honor, it hadn't been discussed before this moment.

17         THE COURT:  Okay.  Okay, all right, that's fair.

18  All right.

19         MR. LEYH:  But it will be.

20         THE COURT:  Right.  I can't force you, obviously,

21  but I invite that approach.

22         Let's talk about the schedule now that I know the

23  issue.  I'm not going to rule on the issue until I've heard

24  your thoughts on the schedule, and I will think about that.

25         MR. CUNNINGHAM:  We have dates according to your

1    form --

2              THE COURT:  All right.

3              MR. CUNNINGHAM:  -- that we are ready to present

4    to you.

5              New Parties deadline will be August the 5th, 2016.

6              Amendments to pleadings will be the same day,

7    August the 5th, 2016.

8              Plaintiff's disclosures, April 29.

9              THE COURT:  Expert's plaintiff?

10             MR. CUNNINGHAM:  Plaintiff's disclosures.

11             THE COURT:  Yeah.

12             MS. WOLFSHOHL:  And, Judge, --

13             THE COURT:  Oh, disclosures?

14             MR. CUNNINGHAM:  Disclosures.  April --

15             MS. WOLFSHOHL:  Yes, which -- Judge you had made

16   the comment, "Go ahead and include your solvency expert

17   there" and so this is separate from the date below, which is

18   additional experts, if any.

19             THE COURT:  Okay, and on the disclosures, I think

20   many of you litigate in District Court as opposed to

21   Bankruptcy, but just in case, initial disclosures are that.

22   They are not set in stone.  They are not final interrogatory

23   answers but they are what you now know on the various topics

24   and so if, for instance, the Plan Agent wants to change or

25   refine the expert report, you can do it up until to the date

1    I'm going to be giving you.

2              Do you understand?

3              MS. WOLFSHOHL:  Yes, Judge, I do.  It's already,

4    you know, it's a report that --

5              MR. CUNNINGHAM:  Anyway, the initial --

6              MS. WOLFSHOHL:  -- we don't anticipate changes.

7              THE COURT:  Okay.

8              MR. CUNNINGHAM:  -- now the initial disclosures

9    for the Plaintiff will be April 29, and then Defendant's

10   Response to Initial Disclosures will be May 13th.

11             And then the expert witness cut off for the

12   Plaintiff is September the 9th.

13             THE COURT:  Just a minute.  May 13.  I was just

14   making some notes.  Okay.

15             MR. CUNNINGHAM:  Certainly.  And then paragraph 2,

16   expert witnesses, is 9/9.

17             And then, three, expert witnesses for the

18   defendant is 10/21.

19             MS. WOLFSHOHL:  10/21, yes.

20             MR. CUNNINGHAM:  Okay.  And then the 3A rebuttal

21   opinions 11/18.

22             THE COURT:  Is it clear that these rebuttal

23   opinions are by existing experts?  We're not opening it up

24   to new experts?

25             MR. CUNNINGHAM:  Yes, ma'am.

1            THE COURT:  Okay.

2            MR. CUNNINGHAM:  And I have, four, discovery

3    completed by February 28th, 2017.

4            THE COURT:  2/28/17.

5            MR. CUNNINGHAM:  Right.

6            THE COURT:  Is there any issue in which the

7    defense has the burden of proof?

8            MR. CUNNINGHAM:  Uh -- ?

9            THE COURT:  The reason I'm asking, even if you

10   don't know it now, if there is an issue, you need to decide

11   whether the defense will disclose an expert with report,

12   et cetera on the first date, this paragraph 2, here?

13           MR. CUNNINGHAM:  Yes.

14           THE COURT:  Or the second date, and if it's the

15   second date, then we have to have the rebuttal date for

16   plaintiff.

17           MR. CUNNINGHAM:  Right.

18           THE COURT:  You following me?

19           MR. CUNNINGHAM:  Yes, ma'am.

20           THE COURT:  Because plaintiff's expert then would

21   want to rebut issues on which the defense has the burden of

22   proof because that's the first time they will have seen

23   those issues opined on.

24           This may be how many angels can dance on the head

25   of a pin, but I don't have an issue in mind for you.

1    MS. WOLFSHOHL:  Well, and Judge, sometimes it
2  comes up that even if it's not a completely separate issue
3  or not an issue that the defense has the burden of proof, we
4  still need to respond.

5    THE COURT:  Right.

6    MS. WOLFSHOHL:  And so I think it's helpful to
7  have an additional date, you know, 30 days after that, that
8  is responsive to the rebuttal to rebuttal is 30 days after
9  rebuttal.

10    THE COURT:  Okay, you have plenty of time in the
11  schedule because February 28th gives you plenty.

12    MR. CUNNINGHAM:  If we can add that time, it's
13  like, I don't know if 12/15 is a good day on the calendar,
14  but we can just put 12/15 for the rebuttal rebuttals.

15    THE COURT:  I'm saying surrebuttal for what it is
16  worth.

17    MS. WOLFSHOHL:  Yes, surrebuttals.

18    THE COURT:  Okay, and let me tell you one other
19  thing.  12, what is it?

20    MS. WOLFSHOHL:  12/15.

21    MR. CUNNINGHAM:  12/15.

22    THE COURT:  12/15.  In my experience -- and I know
23  you-all are at least more experienced than I am, that's for
24  sure, except Plaintiff's Counsel who looks so young.  That's
25  a compliment.

1          MS. WOLFSHOHL:  I'll take that as a compliment,

2     Judge.

3          THE COURT:  Now, as other people used to tell me,

4     "This is something time will cure."

5          But anyway, instead of all these reports, the

6     surrebuttal and rebuttal reports, sometimes lawyers agree to

7     just present their experts, at least, the second, some

8     experts through deposition where they can actually, rather

9     than writing a report, they can go through the opponent's

10    report and say, "I disagree because," and the depo, by

11    agreement, is part of the opinions that the parties are

12    adopting and you don't worry about these later reports,

13    okay?

14         But this form is because sometimes the lawyers

15    don't want to take depos, okay?  Anyway --

16         MS. WOLFSHOHL:  We can decide -- if we --

17         THE COURT:  You can decide later.

18         MS. WOLFSHOHL:  -- decide later.

19         THE COURT:  That's exactly right.

20         MS. WOLFSHOHL:  We're happy to do it either way.

21         MR. CUNNINGHAM:  Did you get paragraph 3, 10/21?

22         THE COURT:  Yeah, I have paragraph 3 as 10/21, 3A

23    is 11/18, and now I have a 3B surrebuttal opinions from

24    existing experts --

25         MR. CUNNINGHAM:  Right.

1          THE COURT:  -- 12/15.

2          MR. CUNNINGHAM:  Correct, and then, four,

3    discovery is February 28th.

4          THE COURT:  Yes.

5          MR. CUNNINGHAM:  And then, now, we have said that

6    we want to do the -- if we're going to mediate the case, we

7    want to try to do it a little earlier, so we're going to do

8    an 8/15/2016 mediation target deadline.

9          THE COURT:  All right.

10         MR. CUNNINGHAM:  And then dispositive motion is

11   March 31, 2017.

12         And joint pretrial order 8/31/2017, which we think

13   is consistent with the guidance you gave us earlier.

14         THE COURT:  Yes, it is.  Well, it's a little

15   longer than I would have anticipated, but it depends on how

16   much time you think you are going to take to brief these

17   motions.

18         And let me also say that if I get these motions

19   decided more quickly than I've allowed for myself, I will

20   advance the other two dates, so this is a little bit of a

21   floating target, moving target.

22         All right, now 3/31 is for all motions, correct,

23   Daubert included?

24         MS. WOLFSHOHL:  We weren't certain when you wanted

25   to hear the Daubert Motions, if that was --

```
 1              THE COURT:  You can --
 2              MS. WOLFSHOHL:  After dispositive or?
 3              THE COURT:  Well, what happens is I usually give
 4  the same date or within a week or so, so that they get
 5  briefed.
 6              I like to turn to motions in a particular case all
 7  at once, and the problem is Daubert Motions sometimes
 8  influence what I can consider in the summary judgment
 9  motions, so they have to be filed at approximately the same
10  time.
11              MR. CUNNINGHAM:  Well, why don't we just do that,
12  that way?
13              THE COURT:  That's what I did.  I wrote it.
14              MS. WOLFSHOHL:  Judge, if we do that, could we
15  have longer on the response date, just because if I get 20
16  motions --
17              THE COURT:  I know, well, you're up against it,
18  aren't you?  Yeah, you're up against it.
19         (Both speaking at the same time.)
20              MS. WOLFSHOHL:  And Daubert Motions.
21              THE COURT:  I don't get to that level of detail in
22  this order.
23              MS. WOLFSHOHL:  So we can move to the --
24              MR. CUNNINGHAM:  Terrific.
25              THE COURT:  I don't have a response date in here.
```

1     MR. CUNNINGHAM:  The truth is they've got a legion
2  of lawyers in that law firm, and it's just Debbie and me
3  working on these motions, so, I just want you to understand
4  -- (laughter in the courtroom.)
5     THE COURT:  But you only had to file one motion.
6  She's going to have motions from him, him, him.
7     All right, here's the point:  I am expecting
8  cooperation from each of you on briefing schedules and the
9  like and deposition schedules and blah, blah, blah, and so
10  the answer is "yes," but I'm not giving you the deadlines.
11     So, my thinking is you shouldn't have everything
12  due the same day, you know, it could be a rolling.
13     MS. WOLFSHOHL:  And I'm sure we could --
14     THE COURT:  I would like to know the schedule when
15  the time gets closer so we know when things are going to be
16  right so that we can then gauge our schedule.
17     MS. WOLFSHOHL:  So, we can file a motion at that
18  time, depending on the motions that are filed.
19     THE COURT:  If anyone wants to change scheduling
20  deadlines, if you can agree, that's ideal.  If you cannot
21  agree, that's okay.  You file a letter and then you are
22  going to have to come see me and it's me, and you are going
23  to -- we'll talk about what makes sense, and then I rule
24  right then and there.  There's no -- Mr. Leyh knows this
25  one.  There's no fussing around.

1          Now, if there's an attorney-client privilege

2 issue, you are still going to have to do that process but it

3 may be that I require briefing or something, but I'm not

4 seeing that in this case.

5          What's your thinking?  I see you standing up.

6          MR. LEYH:  Understood, Your Honor.

7          THE COURT:  Okay. Docket call will be September

8 7th, 2017, and I'll say it's at 2:30.

9          Now, I would like this to be the schedule for both

10 cases, but I do recognize I have two cases.  I will hear you

11 -- well, let's do it this way.

12          Well, let me ask this.  Who thinks the cases

13 should be actually tried together if they get tried?

14          MS. WOLFSHOHL:  I don't think anybody does.  I

15 think we did an informal poll and --

16          THE COURT:  Nobody does. Okay. Well, I was going

17 to say the default position is the cases are separate and if

18 we need to combine them, or I see the point of combining

19 them or I would want to, I'll hear argument and then I'll

20 decide, so you'll be on notice, but the default position is

21 they are separate trial dates.  They may be back to back or

22 something like that, but we'll worry about that when the

23 time comes.

24          MR. LEYH:  If we wanted do like depositions, one

25 deposition, both cases?

1             THE COURT:  Fine.

2             MR. LEYH:  That work?

3             THE COURT:  Encouraged.

4             MR. LEYH:  Thank you.

5             THE COURT:  Encouraged, especially if all the

6    books and records and the technical stuff.

7             MS. WOLFSHOHL:  We're not opposed to that, Judge.

8    I mean, it would just -- we may have to go on two days if

9    there is another lawyer taking --

10            THE COURT:  Well, the 7-hour restriction is

11   something that you've got to be flexible with.

12            MS. WOLFSHOHL:  Okay.

13            THE COURT:  And what about the number of depos?

14   What are we really talking about?  I don't think you are

15   going to exceed the number.

16            MS. WOLFSHOHL:  I don't think there's going to be

17   that many depositions, the other parties may feel

18   differently about it, but we haven't had any depositions in

19   any of our other cases, so.

20            THE COURT:  Oh, you haven't?  Okay.  I mean, I

21   don't know how you guys are used to handling things since

22   this is often done in Bankruptcy Court.

23            MS. WOLFSHOHL:  Usually, there doesn't tend to be

24   a lot of depositions, but these cases could be a little bit

25   different.

1            MR. CUNNINGHAM:  Well, I can tell you that our

2 focus is going to be to take it as soon as possible simply

3 because of costs.

4            THE COURT:  Right.  And Jury was demanded in these

5 cases, as I recall.  That's why --

6            MR. LEYH:  That's correct, Your Honor.

7            THE COURT:  -- withdrawal of the reference, even

8 though it does say Guffy v. Brown, there's no jury demand,

9 but there was in the DeGuerin case.  I know he likes the

10 juries.

11            MR. CUNNINGHAM:  Well, we demanded a jury.

12            THE COURT:  You did, okay, we'll change that.

13            Sheila will change that in 84, 084.

14            All right, I think what I'll do is use your dates.

15 I'll replicate this.  We'll type it out and then I'll enter

16 these dates as agreed, so it's going to say up at the top,

17 "Agreed."

18            MS. WOLFSHOHL:  Judge, are you ruling on the

19 final issue?

20            THE COURT:  Oh, I'd rather --

21            MS. WOLFSHOHL:  If we disclose with our initial

22 disclosures --

23            THE COURT:  What's the volume of documents?

24            MS. WOLFSHOHL:  May 20th.

25            MR. CUNNINGHAM:  This would be unlimited, believe

1  me.

2          MS. WOLFSHOHL:  I mean, there are not -- I mean,

3  we're talking about a Peachtree database, which would give

4  access to the Defendants.

5          THE COURT:  A what?

6          MS. WOLFSHOHL:  A Peachtree database.  It's like

7  QuickBooks that they can manipulate and generate reports or

8  tell us what reports they want and we can get it to them,

9  tax returns.  I mean, I don't -- it's in the hundreds, not

10 thousands as I recall, but you --

11         THE COURT:  Hundreds of what?

12         MR. CUNNINGHAM:  Your Honor?

13         THE COURT:  Hundreds of what?

14         MS. WOLFSHOHL:  Of documents.

15         MS. HOLCOMBE:  Of documents.  We gave -- in other

16 cases, we've given both the actual tangible document in PDF

17 form and then also access to the database.  Like she said,

18 it's sort of like an Excel Spread -- it's what I think of

19 where you can sort of manipulate and pull up the information

20 as you want to see it.

21         THE COURT:  Right.

22         MS. WOLFSHOHL:  It's shortcuts.

23         MS. HOLCOMBE:  So it shortcuts, yeah, with

24 shortcuts having to go through every single thing, like if

25 you were to have thousands and thousands of every page, it

1  sort of a database --

2         MS. WOLFSHOHL:  About how many documents did we

3  produce?

4         MS. HOLCOMBE:  I'd have to -- it's not that many.

5         MS. WOLFSHOHL:  It's probably in the hundreds and

6  not the thousands.

7         MS. HOLCOMBE:  Yeah.

8         THE COURT:  Okay, what's -- you're the one who

9  really has the issue, I think, the issue of articulating.

10        MR. CUNNINGHAM:  Probably, probably.  And I don't

11  know the answer to the question for sure, but I can say

12  this:  There was a major issue about how much time and

13  effort went in to the divorce proceedings, litigation-wise.

14  And what that means is that there are, well, thousands and

15  thousands of material that could bear upon the financial

16  condition of BMC, Inc.

17        And so, although certainly having someone weed out

18  what they like and present it to us in a spreadsheet fashion

19  that we can access, we want the right to be able to discover

20  and to select the information that we think bears on it, and

21  that's why we think there should be some discovery before we

22  are required to come up with an insolvency.

23        THE COURT:  Okay, what does anyone else think?

24        MR. LEYH:  I think I need some time because I

25  haven't seen the insolvency report.

1            THE COURT:  Right.

2            MR. LEYH:  I haven't seen any of these documents

3  other than what was filed in the Florida bankruptcy case.

4            THE COURT:  Why do you care about the Florida

5  bankruptcy?

6            MR. LEYH:  Because there was documents filed by

7  General Grange in regard to the financial condition of the

8  company.

9            THE COURT:  But that was not -- okay.  I'm hearing

10  you there, but that was not the bankruptcy of the company.

11  It was the personal bankruptcy.

12            MR. LEYH:  Correct.

13            THE COURT:  But obviously you want to see what was

14  filed there.

15            MR. LEYH:  Correct.

16            THE COURT:  Who has access to that bankruptcy

17  case?

18            MR. LEYH:  Your Honor, I have a --

19            MS. WOLFSHOHL:  Reports.  All right, go ahead.

20            MR. LEYH:  Because I haven't.  I'm just saying

21  that, that's all I've seen.  I don't know what all there,

22  just the expert.

23            MS. WOLFSHOHL:  I've seen two reports.  We have

24  Mr. Leyh's production.  Under the standard Federal Rules,

25  it's 30 days.  I just don't think it's fair to have seven

1  months.

2         THE COURT:  I understand, okay.  You are going to

3  be turning your stuff over, including the insolvency report.

4         No, let me back up.  How long have you been in

5  these cases?

6         MS. WOLFSHOHL:  Since September.  These were the

7  first cases I filed so, and then we had some other cases

8  filed October 15th, and we've, you know, just disclosed our

9  report in several matters.  It's not -- we haven't been

10  month to month to month.

11         THE COURT:  Can you give me some estimate?  You

12  figure out what measure, about how long it's taking your

13  expert to create the analysis and the report.  How many

14  hours did he spend, or she?

15         MS. WOLFSHOHL:  Judge, I couldn't tell you

16  off-hand.  I mean, I would say that he worked on the report

17  over a period of 60 days in earnest, but he did have a

18  longer period than that when he developed his payments.

19         And he was retained, yeah, it was more than

20  60 days before he started really working on stuff.  So a lot

21  of it was document collection, but we have those documents

22  collected in his report, you know, summarizes opinions and

23  it's supported with citations to those Bates-numbered

24  documents.

25         THE COURT:  Right.  The concern I think from the

1  defense standpoint is that in your universe that this is

2  what happens in criminal cases, but your universe of

3  documents may not be the document universe that they want to

4  be restricted to.  They need to check on that kind of thing.

5          MS. WOLFSHOHL:  Yes.

6          THE COURT:  All right, here's what we're going to

7  do on the insolvency expert reports from the defense:

8          Plaintiffs' will be turned over no later than

9  April 29th.

10         The expert reports on insolvency will be turned

11 over July, three months later, July 29th.

12         The rest of the experts will be the September 9th

13 deadline you've agreed to.

14         The rebuttal opinions on insolvency will be due

15 one month after the -- I'm sorry, yeah, one month after the

16 original or the Defendant's first reports and then

17 surrebuttal will be another month after that.

18         If the discovery does not go as I expect it will

19 go, then we will revisit this request, but I think, frankly,

20 the date I've just given you, July, is six months from now.

21 It's plenty of time.  It's not as good as Government -- I

22 mean --

23         MS. WOLFSHOHL:  Might as well show him the

24 executive button.

25         THE COURT:  Sorry about that.  But the Plan Agent

1   wants, but it will allow experts to be working on different

2   timeframes and I think it will ease the pain for the

3   lawyers.

4             All right, anything else?

5             MR. LEYH:  No, Your Honor.

6             MR. TOWBER:  Your Honor?

7             THE COURT:  All right, if there is a discovery

8   dispute, bring it to my attention by letter, and I do not

9   want you to re-invent the wheel.  You tell me what you want

10  and why, and then I will issue an order setting a conference

11  and the opposing party will have to respond by that deadline

12  and then you will see me a couple of days later.  Okay?

13  That way it keeps the fees down and we don't mess up our

14  schedule.

15            MR. TOWBER:  Your Honor, we have agreed with the

16  Plan Agent that our answer date for the Brown Defendants

17  will be April 7th.  I just wanted to get that agreement on

18  the Record from the Plaintiff's Counsel.

19            THE COURT:  Okay.  What, what?  I was not going to

20  put that in here, but I'm -- you're okay.

21            MR. TOWBER:  Okay, thank you, Your Honor.

22            MS. WOLFSHOHL:  Judge, I just have one question:

23  Are you going to prepare the Docket Control Order or do want

24  us to generate that?

25            THE COURT:  We're going to do one for each case

1    using the dates we've discussed.  Okay?  Anything else?

2          (No audible response.)

3              THE COURT:  All right, thank you, and I'm sorry

4    about the interruption.  I hope it wasn't too bad a delay.

5              MR. CUNNINGHAM:  Thank you, Your Honor.

6              THE COURT:  You are excused.

7          (Proceedings adjourned at 3:13 p.m.)

8                         *  *  *  *  *

9               *I certify that the foregoing is a correct*

10   *transcript to the best of my ability produced from the*

11   *electronic sound recording of the proceedings in the above-*

12   *entitled matter.*

13   */S/ MARY D. HENRY*

14   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

15   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**D-337*

16   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

17   *JTT TRANSCRIPT #55639*

18   *DATE:  AUGUST 25, 2016*

19

20

21

22

23

24

25